In the Matter of Arthur J. HALPERN, Bankrupt-Appellee.

Chase Manhattan Bank, Objectant-Appellant.

No. 85, Docket 31456.

United States Court of Appeals Second Circuit.

Argued Oct. 10, 1967.

Decided Jan. 3, 1968.

James W. Mosher, New York City, (John M. Friedman, New York City, on the brief), for objectant-appellant.

Julius Zizmor, New York City, for bankrupt-appellee.

Before LUMBARD, Chief Judge, and SMITH and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge.

The Chase Manhattan Bank appeals from two orders of the United States District Court for the Eastern District of New York, John R. Bartels, J., which granted Arthur J. Halpern a discharge in bankruptcy. The bankrupt filed a voluntary petition in bankruptcy on October 4, 1965. Chase, his chief creditor, filed three objections to discharge. The referee dismissed two, but sustained another and denied discharge. On the bankrupt's petition for review, the district court dismissed the objection that the referee had sustained, and remanded the petition for further hearings on the other two. In re Halpern, 262 F.Supp. 271 (E.D.N.Y. 1967). After a further hearing, the referee granted discharge. The district court dismissed Chase's petition for review and Chase appealed to this court. We affirm.

The facts are, for the most part, undisputed. From 1957 to 1963, the bankrupt was an officer and employee of three corporations controlled by his father. However, the bankrupt had no financial interest in them and was neither a stockholder nor a director. As an officer of Vaughn Construction Corporation, the bankrupt executed notes, checks, purchase orders and indemnity bonds. In July 1962, Vaughn was engaged in Troy, New York on a large construction job for the United States Army. The bankrupt, who was then twenty-four or twenty-five and with no significant assets, joined other members of his family in personally guaranteeing a Chase construction loan on the project. In November 1962, to improve Vaughn's line of credit with Chase, the bankrupt pledged to Chase a $25,000 savings account in his name already on deposit with Chase. A few months later, a cofferdam collapsed at the Troy construction site with tragic consequences.[1]

Shortly thereafter, the bankrupt's life fell to pieces: He left his father's employ, he attempted to defraud Chase of its $25,000 security (in a manner more fully described below), he tried to commit suicide, and then his marriage broke up. From that time until he filed his petition two and one-half years later, his earnings averaged about $2,000 a year.

Chase presses before us only two objections:[2]

1. The bankrupt has destroyed, mutilated, concealed or failed to keep or preserve books of account or records from which his financial condition and business transactions might be ascertained.

2. The bankrupt has committed an offense punishable by imprisonment as provided under Title 18, United States Code, section 152, in that the bankrupt,

---

1. Two employees were killed and two were injured, see Lipka v. United States, 369 F.2d 288 (2d Cir. 1966). In addition, Arthur Halpern's father and mother, Joseph and Evelyn Halpern, were adjudicated bankrupt in February 1965. In re

Halpern, Civ. No. 66–B–88–89 (E.D.N.Y. Feb. 18, 1965), aff'd without opinion, Dkt. Nos. 29704–05 (2d Cir. June 10, 1965).

2. The other was withdrawn during the proceeding before the referee on remand.

in contemplation of bankruptcy, or with intent to defeat the bankruptcy law, on or about May, 1963, knowingly and fraudulently transferred or concealed certain of his property in the amount of $25,000.00.

Turning to the former, the Bankruptcy Act provides that no discharge shall be granted if the bankrupt has failed to keep books of account from which his financial condition and business transactions might be ascertained, "unless the court deems such * * * failure to have been justified under all the circumstances of the case * * *." Section 14c(2) of the Bankruptcy Act, 11 U.S.C. § 32(c)(2). It is conceded that the bankrupt kept no personal books. Consequently, discharge depends upon justification for this failure, an issue upon which the bankrupt bears the burden of proof. See, e. g., White v. Schoenfeld, 117 F.2d 131, 132 (2d Cir. 1941) (per curiam); 1 Collier, Bankruptcy ¶14.33, at 1370–73 (14th ed. J. Moore 1967).

The referee denied discharge because he found that the bankrupt was a responsible corporate officer, not "a mere employee," and that he should have maintained books revealing his financial condition and business transactions. The district court reversed because all of the bankrupt's significant transactions were on behalf of the corporations, the corporate books were admittedly adequate, and personal books "recording the same transactions" would have been both unnecessary and unusual; therefore, "failure of the bankrupt to keep books was patently justified."

▬ Whether failure to keep books should bar a discharge in bankruptcy is "a question in each instance of reasonableness in the particular circumstances." In re Underhill, 82 F.2d 258, 259–260 (2d Cir.), cert. denied, Underhill v. Lent, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936); see In re Sandow, 151 F.2d 807, 809 (2d Cir. 1945). To meet this test, the bankrupt must show that a failure to keep books comports with the "vague, but imperative, dictates of ordinary fair dealing, or common caution * * *." Karger

v. Sandler, 62 F.2d 80, 81 (2d Cir. 1932) (per curiam). In most cases, the complexity of the bankrupt's business activities determines whether he should have maintained books. See Baker v. Trachman, 244 F.2d 18, 20 (2d Cir. 1957) (per curiam); White v. Schoenfeld, 117 F.2d 131, 132 (2d Cir. 1941) (per curiam). But, as we noted in Morris Plan Indus. Bank of New York v. Dreher, 144 F.2d 60, 61 (2d Cir. 1944), this "is a loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved." For example, in *Dreher*, an "itinerant peddler of rags and old clothes," who had incurred debts over a decade earlier, was granted a discharge because people in his business would not ordinarily keep books. Similarly, in In re Pinko, 94 F.2d 259, 261 (7th Cir. 1938), a mere salaried employee was held not required to keep books. In that case, the books of an earlier construction business run by the bankrupt were in the possession of his former wife; his failure to place them before the referee was excused because the objecting creditor had "made no effort to require their production * * *." See also In re Lepine, 4 F.Supp. 808 (E.D.N.Y.1933), aff'd per curiam, 70 F.2d 1017 (2d Cir. 1934); In re Weisman, 1 F.Supp. 723 (S.D.N.Y.1932); cf. Morris Plan Indus. Bank v. Henderson, 131 F.2d 975 (2d Cir. 1942). Where the bankrupt, on the other hand, is the principal or a truly responsible officer of a corporation, and incurs substantial obligations as a result of corporate activities, he is required to keep books and records. See Karr v. Marshall, 262 F.2d 358 (2d Cir. 1959) (per curiam); In re Sandow, 151 F.2d 807 (2d Cir. 1945). Such a bankrupt does not meet his burden by merely referring to the corporation's books; unless the objecting creditors concede that those books will adequately show the bankrupt's financial condition and business transactions, the bankrupt must produce the books. See White v. Schoenfeld, 117 F.2d 131 (2d Cir. 1941) (per curiam). By the same token, production of corporate records will not suffice where

the bankrupt engaged in substantial personal business not reflected on the corporate books. In re Muss, 100 F.2d 395 (2d Cir. 1938).

■ On the facts of this case, we find the following circumstances particularly relevant. The bankrupt's position in the corporations was not one of authority— he did what his father told him to do, understandably so in view of his youth; he worked eight hours a day at what he described as "office and administrative work," receiving a weekly salary; he had no financial interest in any of the corporations, and no independent business activities; $90,522.66 of the $96,482.66 in debts listed in the petition arose directly from his actions on behalf of his father's corporations, and over $85,000 from just two guarantees for Vaughn Construction Corporation; the bankrupt, who had no significant assets, did not sign the guarantees for his personal benefit; and, finally, Chase does not challenge Judge Bartels's statement that the corporate books adequately reflected the bankrupt's business transactions on behalf of the corporations.[3] We conclude that the bankrupt was justified in not keeping personal books of these same transactions, and that his activities on his own behalf required no books. In sum, we hold that the district court could fairly find that the bankrupt's failure to keep books and accounts was "justified under all the circumstances of the case."

■ Chase argues that, in any event, the bankrupt did not keep proper records of the $25,000 he first pledged with Chase and then "fraudulently got back" from it. This incident occurred as follows: In 1962, the bankrupt had pledged with Chase a $25,000 savings account already on deposit with it. After the 1963 catastrophe at the Troy construction site, he offered Chase as substitute security a Chemical Bank New York Trust Company passbook showing a $25,000 balance.

Chase agreed, and released the $25,000 Chase savings account to the bankrupt. However, Chemical refused to acknowledge the assignment of the passbook because the amount shown therein represented a check forged by the bankrupt and drawn on his father's account. The bankrupt testified that of the $25,000 thus misappropriated, $16,500 was returned to his father, $2,500 was used on a three-month trip to Lebanon to pull himself together and to try and find a new job, $1,000 was spent by his wife before she left him, and the remaining $5,000 was taken by his wife at that time. Chase suffered no actual loss; when the $16,500 was returned to the bankrupt's father, he approved payment of the forged $25,000 check, thus validating the Chemical savings account which Chase had as substitute security. Chase immediately took possession of the funds. There was no effective concealment of the abortive fraud from Chase; the bank was fully aware of what the bankrupt was returning to his father and, according to the testimony of the bankrupt's attorney, approved this disposition of an unfortunate situation. Of course, the son's attempt to defraud his father was deplorable, but the transaction was not the sort in which one would expect records to be kept. Cf. Klein v. Morris Plan Indus. Bank, 132 F.2d 809, 811, 144 A.L.R. 1278 (2d Cir. 1942). Under all the circumstances, we do not feel that this isolated incident justifies denying the bankrupt a discharge to which he is otherwise entitled.

■ Chase's second objection to discharge can be disposed of more summarily. The sole question it raises is whether the referee, and then the district court, made a clearly erroneous finding of fact when they held that the bankrupt did not act "in contemplation of a bankruptcy" or "with intent to defeat the bankruptcy law" when he withdrew the $25,000 on

---

3. In this court, Chase emphasizes the bankrupt's failure to produce the corporations' books. However, the point was not adequately raised below; Chase argued the first objection solely as a ques-tion of whether any books were required at all, and explicitly denied any interest in what the corporations' books might reveal.

deposit with Chase. See section 14c(1) of the Bankruptcy Act, 11 U.S.C. § 32 (c)(1). We adopt the language of Judge Bartels on this point:

> After a review of the record and consideration of the fact that a bankruptcy petition was not filed against the bankrupt until two and one-half years after the concealment, that the sudden collapse of the cofferdam caused the father's bankruptcy, that the father's bankruptcy caused the bankruptcy of the son as an endorser of the obligations of the father and his corporations, and that the bankrupt believed that the father's corporation would be permitted by the Government to continue the performance of its contract at the time he concealed his property, the Court cannot say that the Referee's finding is clearly erroneous.

The orders appealed from are affirmed.