**In re Barbara USOSKIN, Debtor.**

**Hukumad CHAUDHRY and Haridas Shah, Plaintiffs,**

**v.**

**Barbara USOSKIN, Defendant.**

**Bankruptcy No. 183–31433–21.**
**Adv. No. 183–0400.**

United States Bankruptcy Court, E.D. New York.

Nov. 27, 1985.

Robert Tauber, Brooklyn, N.Y., for debtor.

Manojkumar D. Patel, New York City, for plaintiffs Chaudhry & Shah.

CECELIA H. GOETZ, Bankruptcy Judge.

This is an adversary proceeding brought by two creditors, Hukumad Chaudhry and Haridas Shah, of the debtor, Barbara Usoskin, objecting to the discharge of her debts in bankruptcy. Although their complaint invokes only 11 U.S.C. § 727, covering objections to the discharge *in toto* of all debts, their post-trial memorandum also implicates § 523(c) which deals with the dischargeability of specific debts.

This is a core proceeding which this Court is authorized to hear and determine. 28 U.S. § 157(a), (b)(2)(I) and (J).

For the reasons set out more fully below, this Court finds the complaint to be wholly without substance and not to have been filed in good faith.

### The Proceedings Herein

Barbara Usoskin filed a petition for relief under Chapter 7 on July 22, 1983. She acted *pro se*. Her petition shows as assets a car, household furniture and clothing: all claimed as exempt and having a total value of $1,100.00. It shows liabilities totaling $42,228.40, including a debt to the plaintiffs in the amount of $25,450.44. (Tr. 11/16/84 at 69). Among the debts shown are $5,000.00 owed to Murray and Evelyn Usoskin, subsequently identified as Usoskin's parents, and $8,000.00 owed Frank and Jean Rosenberg, her uncle and aunt. (Tr. 10/26/84 at 91; 11/16/84, at 35–36, 58–65).

On October 24, 1983, Shah and Chaudhry filed a complaint objecting to Usoskin's discharge. The complaint pleaded that Usoskin, with one Simion Ksenzowski, had purchased a store from the plaintiffs, had defaulted on the notes given as part of the purchase price, and requested judgment against the defendants in the amount of $26,500.00.[1]

After the Court had, at a pre-trial hearing, noted that the complaint was vulnerable to dismissal for failure to state a claim, the plaintiffs served an amended complaint which incorporated in *haec verba*, several sections of 11 U.S.C. § 727. It also alleged that Usoskin, by a materially false statement in writing respecting her financial position, had obtained the "business property and loan-money by fraud".

Barbara Usoskin filed an answer prepared on her behalf by Richard Koral, Esq., a friend. (Tr. 11/16/84 at 157–58). At the pre-trial hearing on February 7, 1984, the Court scheduled the trial for April 30, 1984. On March 23rd or 24th, 1984, plaintiffs' attorney, Manojkumar D. Patel, left for India, advising neither the Court nor Koral nor Usoskin of his departure. Just before leaving he sent Koral a demand for discovery and inspection of documents demanding production within the next 30 days at his office, which he closed on his departure. (Application of Richard Koral, Esq., dated May 1, 1984; Plaintiffs' Appli-

---

1. The complaint consistently refers to the defendants in the plural, because it has prepared to be filed as a single complaint against both Usoskin and her partner, Simion Ksenzowski, who had filed a petition for relief under Chapter 7 of Title 11. It was subsequently prosecuted independently against each. The case against Ksenzowski was never tried because it was closed for failure to prosecute.

cation to Set Aside a Default Order and to Restore Adversary Proceeding to Calendar, dated July 26, 1984).

On the scheduled trial date of April 30, 1984, neither Patel nor plaintiffs were in court, whereupon the Court adjourned the matter peremptorily to May 17, 1984. Thereafter, Koral filed a motion to dismiss based on the failure of the complaint to state a cause of action and failure to prosecute.

Patel, on his return May 14, made no inquiry respecting what had happened on the scheduled trial date, nor he claims, did he learn of Koral's motion, but he did communicate with Koral to demand compliance with his discovery demand. In accordance with that demand, Usoskin and Koral came to the court on May 25, 1984 with her records and displayed to Patel and to his clients her checks, receipts, invoices and bank statements. (Tr. 10/26/84 at 69–73). She did not produce any tax returns; she had filed none in 1983 because her income was too low to require a return. (Tr. 10/26/84 at 101). She also produced no promissory notes showing debts to persons other than the plaintiffs and no general ledger. (Tr. 10/26/84 at 101). The same records she produced pre-trial she also produced in court on November 16, 1984, adding a new document she received from her uncle showing the dates and the amounts of the loans he had made her. (Tr. 11/16/84 at 20–33, 63–65, 202–205).

On May 17th, for the convenience of the Court, both Usoskin's motion to dismiss and the pending trial were adjourned to June 7, 1984. On that day, neither Patel nor his clients were in court, nor was the defendant. The proceeding was thereupon closed by the Court. When Patel learned of these events, he moved to reopen the default, to which Robert Tauber, Esq., who had replaced Koral as attorney for Usoskin, agreed. Mr. Tauber also waived a decision on the motion to dismiss, so that the case could go to trial on the merits, which it then did.

At the trial, the only witnesses were the two plaintiffs and the defendant.[2]

## FINDINGS OF FACT

On August 19, 1982, Barbara Usoskin and Simion Ksenzowski entered into a contract to buy a stationery store, which the plaintiffs had been operating for about two and a half years. Usoskin and Ksenzowski had just sold for about $6,000.00, a car service business, which they were then operating in partnership, Ksenzowski having bought out Usoskin's previous partner some time earlier. (Tr. 10/26/84, at 39, 82, 109; Tr. 11/16/84 at 48–51, 119, PX 12).

Usoskin and Ksenzowski agreed to pay $40,000.00 for the business. The contract of sale assigned a value of $10,000.00 to the inventory, $1,000.00 to the furniture and fixtures and the balance to good will and the seller's covenant not to compete. (Tr. 11/16/84 at 53–54, 220; PX 12). In the contract of sale, the gross receipts of the business were represented to be $2,500.00 a week, to be confirmed by a test week chosen by the sellers who selected the week following Labor Day. (Tr. 11/16/84 at 211–212, 216–217 PX 12).

Neither Shah nor Chaudhry requested a written statement as to financial history. (Tr. 10/26/84 at 83). They did not learn that she had resorted to bankruptcy in 1972 as a result of an illness. (Tr. 11/16/84 at 137–144, 229).

The closing took place on September 14, 1982, following the week chosen by the sellers as a trial period, the opening of school after Labor Day. Usoskin and Ksenzowski paid Shah and Chaudhry $14,-500.00 in cash and gave notes for the balance of $26,500.00, consisting of 40 promissory notes, each in the sum of $807.08, the first due on October 14, 1982, and monthly thereafter. As security for the payment of the note, the sellers were given a security

---

**2.** Although the trial was concluded in November, 1984, the parties filed their briefs herein less than 60 days ago.

interest in all the inventory and equipment. They also retained, in escrow, the lease and the assignment of the lease. The closing took place in the office of Usoskin's attorney. A sales tax was paid on the sale of the equipment. (Tr. 10/26/84 at 9–20, 54–60; PX's 1–6, 9).

Usoskin obtained the cash for the down payment from the proceeds of the sale of the car business, from loans from her relatives and from her partner, Ksenzowski. (Tr. 10/26/84 at 7, 55, 82–83; 11/16/84 at 200–201; PX 13).

When Usoskin took possession of the store, the Monday following the closing, she found the inventory left her to be worth no more than $500.00. (Tr. 10/26/84 at 84; 11/16/84 at 55–56). The greeting cards were water damaged, the edible stock had been eaten by mice, no stationery or cigarettes were left, and all the paper goods were filthy. (Tr. 10/26/84 at 85–86). When she asked Chaudhry what had happened to the stock, he told her that he and Shah had sold it off up to the date of the closing and she would have to replace everything. (Tr. 10/26/84 at 85). Usoskin telephoned her attorney to complain that Shah and Chaudhry had lied and cheated her, but he advised her that there was nothing she could do and that she was bound by the contract. (Tr. 10/26/84 at 85; 11/16/84 at 54).

Unable to extricate herself from her bargain, Usoskin tried to make the best of it. After she found the store had no credit, she borrowed money from her uncle and bought about $2,000.00 worth of school supplies. (Tr. 10/26/84 at 86; PX 13).

She shortly encountered other problems. She discovered that the basement was a shambles and learned that as a tenant she was expected to take care of the heat and all repairs. (Tr. 11/16/84 at 189–190). After she had been there a month or two, the compressor broke and its repair cost $475.00. (Tr. 11/16/84 at 184). When she complained to the landlord, he told her that under the lease she was completely responsible for the maintenance of the building. (Tr. 11/16/84 at 190). The rent was $350.00 a month and the electricity cost $100.00 a month or more. (Tr. 11/16/84 at 10).

Although she had been told that everything was in working order, she discovered that the freezer did not work in the summer and the ice cream spoiled. She tried to repair the store's equipment, but none of it ever worked properly because of the age of the store. (Tr. 11/16/84 at 190–191).

Trying to make a go of the place, she opened up at 6:00 in the morning and closed at 7:00 at night, working six and a half days a week. Her partner, Ksenzowski, usually came in about 2:00 p.m. and stayed until 7:00 p.m., also working six days a week. In addition, she had a young assistant whom she paid about $30.00 a week, who worked about 14 hours. (Tr. 11/16/84 at 7–8).

After the first two weeks of operation, when she and her partner each drew $150.00 a week as salary, she reduced their draw to $50.00 or $75.00 a week. (Tr. 10/26/84 at 87). Because she could not live on what she drew and had no other income, she began to borrow money from a friend and accept gifts from her relatives. (Tr. 11/16/84 at 16–19, 34).

The stationery store was entirely a cash business, it operated on the margin of 35 to 50 percent. (Tr. 10/26/84 at 39, 87; Tr. 11/16/84 at 10, 233). Usoskin kept no general ledger. When she first took the store over, she tried to keep the same kind of daily record as Shah and Chaudhry had maintained, that is recording each day's gross receipts and payments in a small notebook. (Tr. 11/16/84 at 72–73; PX 17). Her accountant, however, advised her that what she was doing was valueless and she stopped. He instructed her to keep her invoices and checks in order, to keep her checkbook up to date and keep her bills in sequence. (Tr. 10/26/84 at 76–77, 88–89; PX 16). These are the documents she showed the plaintiffs on May 25, 1984 and produced in court; her bank statements, checks, receipts for bills paid in cash and invoices. (Tr. 11/16/84 at 206–215; Tr.

10/26/84 at 82). She has destroyed no records. (Tr. 10/26/84 at 104–105).

In December, 1982, Usoskin suffered a further setback. After she had borrowed another $2,400.00 from her uncle to restock, burglars broke into the premises through a hole in the roof, taking everything that was in the unopened cartons, all the school supplies, all the cigarettes and whatever else they could find. (Tr. 10/26/84 at 91–92). She was never able to restock the store properly. (Tr. 10/26/84 at 45).

Shah and Chadhry kept themselves informed as to what was going on through periodic visits to the store. They noted that the inventory had declined because it was not being replaced, that in October and November, Usoskin was not stocking all the brands of cigarettes in demand and that during the Christmas season, greeting cards were not available. (Tr. 10/26/84 at 223–227).

Despite all her financial difficulties, Usoskin paid off the notes each and every month until May, when she paid only half of what was due, bringing the total paid to Shah and Chaudhry to approximately $20,000.00. (Tr. 10/26/84 at 20–21, 62–90).

She asked Chaudhry to extend the payments so as to reduce them to $400.00 a month, but her request was refused. (Tr. 10/26/84 at 95). When she obtained a buyer for the store, Chaudhry told her that she would have to pay off the entire unpaid balance of the notes at the time of transfer, so she was forced to rescind the sale. (Tr. 10/26/84 at 96).

She consulted a local bar association and was told that her only recourse was bankruptcy. When Chaudhry came to collect the balance due for May, she told him that she was going to declare bankruptcy. (Tr. 20/16/84 at 23, 96–97).

After she had made up her mind to close the store on July 4th, she tried on three separate occasions in June to return the keys of the store to him, but he refused them on each occasion. She then returned the keys to the landlord. Prior to closing she ran a sale which grossed around $283.00. (Tr. 11/16/84 at 105–110). She left in the store all the equipment she had bought and all the inventory on hand, including cigarettes, greeting cards, toys, napkins and paper plates. (Tr. 10/26/84 at 99–100; Tr. 11/16/84 at 10–53).

Obtaining the necessary forms free of charge from the Jewish Board of Family & Children's Services, she prepared a bankruptcy petition *pro se*, assembling all her documents herself. To determine how much she owed each supplier, she called each one, told them that she was filing bankruptcy, asked them what balance she owed, wrote it down and listed it in her schedule. She filed her petition on July 22, 1983. (Tr. 10/26/84 at 100; Tr. 11/16/84 at 91–93, 56–58).

She inadvertently failed to include in her petition two savings accounts, closed several months earlier on November 4, 1982 and December 9, 1982, and a third with a balance of $6.98. She thought she only had to indicate current accounts on her petition. (Tr. 10/26/84 at 102; Tr. 11/16/84 at 196–206; DX A; PX 21A, 21B, 21C).

## The Plaintiffs' Civil Court Proceeding

After sending Usoskin a formal demand by certified mail (which she denies receiving) for payment of its June and July notes, Shah and Chaudhry brought suit in the Civil Court of the City of New York, County of Kings, against Usoskin and Ksenzowski on July 14, 1983, to declare the defendants in default under the security agreement. (Tr. 11/16/84 at 146–147). They asked the Court to restore to them possession of the rented premises and the inventory and equipment. Usoskin denies that service of this complaint was ever made on her. Nevertheless, a default judgment was entered on July 14, 1983. (Tr. 10/26/84 at 24–26; Tr. 11/16/84 at 99–101, 146–147; PX 8).

The filing of the bankruptcy petition on July 22, 1983 would appear to have automatically stayed the state court foreclosure proceeding, which named Usoskin and

Ksenzowski as defendants.[3] Despite the stay, Shah and Chaudhry sold the contents of the store at public auction on August 2, 1983. They paid a locksmith $108.00 to open the store at the direction of the marshall. (Tr. 10/26/84 at 26–31). They claim they found no inventory in the store and that equipment was missing. They also claim that they lost sales until they could get the store functioning again. (Tr. 10/26/84 at 42, 46, 78).

This Court is expressing no opinion at this time with respect to whether or not the plaintiffs' sale of what would appear to have been property of the estate constituted contempt of court. Furthermore, since this proceeding is not one to strike the plaintiffs' claim, the Court is not expressing any opinion of the effect on that claim of the foreclosure sale.

*Usoskin's Present Financial Condition*

Because Usoskin found her experience with the plaintiffs' stationery store so traumatic, she was forced to seek psychiatric assistance and still is unable to work. (Tr. 11/16/84 at 149–152). She had a "nervous breakdown" and was hospitalized for four days right after surrendering the store. She is still receiving therapy every week. (Tr. 11/16/84 at 97–98). At the time of the trial and for about one year prior thereto, she was living on welfare payments of $150.00 every two weeks and food stamps, supplemented by gifts from her mother. (Tr. 11/16/84 at 95–96, 166–167).

She lives in an apartment which she has shared at times for which the rent is $332.97 a month and in which she has lived for the last 12 years. (Tr. 10/26/84 at 107, 110–111). She owns bedroom, living and dining room furniture, all 12 years old, a clock radio and some stereo equipment. (Tr. 10/26/84 at 105; Tr. 11/16/84 at 114). She also owns a 15 inch color television set, eight years old. (Tr. 11/16/84 at 114). She operates a car which Chaudhry described as "An old car, a secondhand car",

she owns a dog and a cat, both given to her as gifts. (Tr. 10/26/84 at 51; Tr. 11/16/84 at 3–4, 114–115)).

In order to keep down her insurance costs, she used her sister's residence to obtain a New Jersey driving license. (Tr. 10/26/84 at 123–125). In the expectation that she would be getting her discharge in bankruptcy and be able to move, she has transferred the registration of her car to Pennsylvania. (Tr. 10/26/84 at 116–122).

For seventeen years, Usoskin worked as a legal secretary. (Tr. 11/16/84 at 136–137). In 1980 her gross income was $10,-666.00, in 1981, about $5,000.00, in 1982, about $8,000.00. (Tr. 11/16/84 at 122–137). She cannot remember whether she filed a tax return in 1982. (Tr. 11/16/84 at 131–133).

The Court found Usoskin's testimony credible and convincing. She impressed the Court as an ingenuous, unsophisticated woman entirely lacking in guile. She is obviously not an experienced business woman, which may have been a factor in her business failure. (Tr. 11/16/84 at 225–227).

On the other hand, Shah and Chaudhry each made a very negative impression. Neither appeared to have any respect for the oath he had taken to tell the whole truth. Their claim that Usoskin represented herself as an experienced businesswoman and they believed her, flies in the face not only of her appearance, but of the fact that they persuaded her to agree to accept as a representative trial week the week following the opening of school when a neighborhood stationery store, however moribund normally, does a land office business. Nor is the Court willing to believe that after Usoskin closed the store in July, Shah knew nothing of what had taken place, that "nobody knew who had the key and we didn't know anything at all what to do there". (Tr. 10/26/84 at 63). How is such ignorance to be reconciled with Shah's

---

**3.** 11 U.S.C. § 362(a) provides, *inter alia,* that the filing of a bankruptcy petition operates as a stay, applicable to all entities, of any act to obtain possession of property of the estate or enforce any lien against property of the estate.

knowledge of such details as the store's cigarette inventory in October and November. (Tr. 11/16/84 at 226). Neither Shah nor Chaudhry is entitled to any credence.

Accordingly, any conflict between the facts as recalled by Usoskin and as testified to by Shah and Chaudhry have been resolved in favor of Usoskin, based on the Court's evaluation of their respective truthfulness.

### The Relevant Statutes

Section 727 (11 U.S.C. § 727) provides, insofar as pertinent, as follows:

(a) The court shall grant the debtor a discharge unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

Section 523(a)(2) excepts from discharge a debt for money, or credit, obtained by:

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

### DISCUSSION

#### I

The "release of the honest, unfortunate, and insolvent debtor from the burden of his debts ... in the interests of his family and the general public is one of the main, if not the most, important, objects of the [Bankruptcy] Law". *Shelby v. Texas Improvement Loan Co.*, 280 F.2d 349, 355 (5th Cir.1960) (citations omitted). *See also, Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

■ In line with this underlying policy, the grounds for objecting to a debtor's discharge are few and carefully defined. (11 U.S.C. § 727). Conduct, no matter how reprehensible, will not forfeit a discharge unless it is covered by one of the sections of 11 U.S.C. § 727. *In re Hughes*, 262 F. 500 (2d Cir.1919); *In re Little*, 65 F.2d 777 (2d Cir.1933); *In re Chamberlain*, 180 F.304 (N.D.N.Y.1910); *In re Gentile*, 107 F.Supp. 476, 477 (W.D.Ky.1952). "A bankrupt is not to be denied a discharge on general equitable considerations. It can only be denied if one or more of the statutory grounds of objection are proved".

*Shelby v. Texas Improvement Loan, supra,* at 355 (and cases cited therein).

■ A creditor objecting to a debtor's discharge has the burden of proof. Bankruptcy Rule 4005. Furthermore, the statute is to be construed liberally in favor of debtors and strictly against the objecting creditor. *In re Adlman,* 541 F.2d 999, 1003 (2d Cir.1976); *In re Leichter,* 197 F.2d 955, 959 (3d Cir.1952), *cert. denied,* 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); *In re Devers,* 759 F.2d 751, 753–54 (9th Cir.1985); *In re Rubin,* 12 B.R. 436, 440 (Bankr.S.D.N.Y.1981).

In this case, the plaintiffs offered virtually nothing in support of their objections to Usoskin's discharge other than the formal documents establishing her purchase of their store and her default on the notes she gave in payment of a portion of the purchase price. What the plaintiffs proved was the existence of an ordinary debt dischargeable in bankruptcy. They failed to support the boiler plate allegations of the complaint copied intact from § 727.

Throughout this proceeding, the plaintiffs have focused on a few circumstances: what Usoskin disclosed as to her prior bankruptcy and what other representations she had made as to her financial situation when she bought their store; her present lifestyle and expenditures; how accurately her petition reflected her debts at the time she filed; and what records she has kept and preserved, in particular, of her debts to her relatives.

As to each of the foregoing, the evidence established little or nothing of any factual or legal significance favorable to the plaintiffs. With respect to some, the evidence showed that the facts were totally at variance with, and could not have been more foreign, to the plaintiffs' allegations.

## II

Starting with the assertion that Usoskin was granted a discharge in a case commenced within six years of the filing of this petition, plaintiffs claim that she "was bankrupt at the time [she] bought the plaintiffs' business"; "was insolvent and was ineligible to buy and operate this business store"; that she "did not disclose her ineligibility to plaintiffs"; and therefore "has knowingly and fraudulently made a false representation ... to persuade the plaintiffs to sell this business to her". Plaintiffs' Post-Trial Memorandum of Law Statement ("P. Memo."), at p. 4.

The basic premise is erroneous. Usoskin's previous petition was filed ten, not six years, before the petition herein. Tr. 11/14/84, at 134. Her resort to bankruptcy in 1972 proves nothing whatsoever as to her solvency a decade later.

■ Furthermore, the Court does not credit plaintiffs' testimony that the plaintiffs inquired as to Usoskin's financial situation before they took her money. Indeed, it would be surprising if any questions had been asked, since plaintiffs could not lose on a deal which cleared them $14,500.00 in cash immediately, plus $26,500.00 in notes, in return for surrendering possession of a store containing equipment and inventory which they, themselves, valued at no more than $11,000.00.

■ But even if the facts were as claimed by the plaintiffs, even if Usoskin had made a false representation as to her financial status on which the plaintiffs had relied, Usoskin would still be entitled to her discharge. First, when Congress enacted this Code, it deliberately changed the law so that a discharge *in toto* can no longer be denied on the basis of a misrepresentation as to one's financial position. H.Rep. 95–595, 95th Cong. 1st Sess., 128–129 (1977), U.S.Code Cong. & Admin.News 1978 p. 5787. Unlike Section 14c of the Bankruptcy Act (former 11 U.S.C. § 32), 11 U.S.C. § 727 does not include as one of the grounds for denying a discharge from all debts, the use of a materially false statement in writing respecting financial condition to obtain money or credit while engaged in a business. Second, even for the limited purposes of blocking the discharge of a specific debt under § 523(a)(2), the misrepresentation must have been in writing. Usoskin never gave the plaintiffs a

written statement regarding her past or present financial condition (Tr. 10/26/84 at 83) and none has been produced.

There is no basis, therefore, for the plaintiffs' attempt to somehow deny Usoskin a discharge of her debt to them because ten years ago she also was unfortunate enough to need bankruptcy relief.

### III

■ Nothing was shown up at the trial as so devoid of truth as the plaintiffs' repeated claim that Usoskin enjoys a "luxurious" lifestyle. What are the facts: they are that she is living on welfare, food stamps and the charity of her relatives. Indicative of plaintiffs' bad faith in repeatedly attributing to Usoskin a luxurious lifestyle, is Chaudhry's contemptuous description of her car when his attorney was trying to lead him into substantiating their claim. Asked what car she drives, Chaudhry responded "An old car, a secondhand car". Voluntarily amplifying this response, he added, "She has a dog, too". (Tr. 10/26/84, at 51). The plaintiffs must know that in New York the possession of an old secondhand car and ownership of a dog does not make a welfare client the possessor of a luxurious lifestyle.

Usoskin's alleged luxurious lifestyle was the predicate for the claim that she has "transferred, removed, destroyed, mutilated or concealed property", thus forfeiting her discharge under § 727(a)(2).

The fact that plaintiffs have been unable to produce any evidence whatsoever that this debtor, living on welfare and borrowed money, has riches secreted away has in no way dissuaded them from insisting on her hidden wealth. Thus, their post-trial memorandum blandly asserts: "The defendant must have some other private property and bank accounts in some other state, which the defendant has failed to disclose in her statement of assets in this case. The defendant lives in a most expensive life style and must have some undisclosed assets and money in bank accounts". (P. Memo, p. 4).

No luxurious lifestyle has been proved; hence, no inference of a concealment of assets arises.

### IV

Despite the minute examination to which Usoskin was subjected by plaintiffs' attorney respecting the accuracy of her petition and, in particular, her listed debts, no evidence was produced to support the complaint's allegation that she "knowingly and fraudulently, in or in connection with the case * * * made a false oath or accounts". § 727(a)(4). In fact, she had prepared her petition meticulously, like the legal secretary she used to be. Every entry was substantiated. As the trial made clear, plaintiffs had no reason to believe otherwise.

■ The only error in her petition—volunteered by her—was the omission of three small savings accounts, two of which had been closed with zero balances several months before she filed for bankruptcy and the third which had a balance of less than $7.00. The failure to schedule worthless property does not bar a discharge. 4 *Collier on Bankruptcy*, Par. 727.04, at 727–53 (15th Ed.1984). As the Second Circuit noted in *In re Carter*, 32 F.2d 186, 188 (2d Cir.1929), when the debtor failed to list a few pieces of office furniture and some worthless stock: "We do not think that a bankrupt ought to be deprived of his discharge for failing to schedule such inconsiderable and valueless items as these". *See also, Avallone v. Cross*, 309 F.2d 60 (2d Cir.1962).

### V

Turning to plaintiffs' last point, the claimed inadequacy of the records kept by Usoskin, it is no better than the others. The plaintiffs assert:

"The defendant has failed to keep accounts, books and records to support and substantiate a genuineess (sic) of the debts. The defendant also failed to produce all documents and certified ac-

counts of the business debts and assets and personal debts.

\* \* \* \* \* \*

The defendent-debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records and papaers (sic), from which the debtor's financial condition or business transaction might be ascertained. The defendant has failed to produce certified accounts of the business and failed to establish the genuineness of all debts.

The defendent-debtor knowingly and fraudulently in connection with the case made a false accounts without any supporting legal and bonafide documents. The defendant has failed to comply with plaintiffs' Notice of Discovery and production of documents and certified accounts." (P. Memo, p. 3).

None of these assertions is borne out by the record. Thus, there is no evidence that Usoskin failed to produce all the documents in her possession and control embraced by plaintiffs' Notice of Discovery. That the plaintiffs were dissatisfied with the records produced does not mean that anything was withheld. There is likewise no evidence of any concealment or destruction of records.

■ Plaintiffs apparently do not like the kind of records which Usoskin kept, but all that the bankruptcy law requires is that the debtor keep and preserve records from which his financial condition can be ascertained. The governing principles were lucidly expounded by the Second Circuit in *In re Underhill*, 82 F.2d 258 (2d Cir.), *cert. denied*, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936), an opinion which neither time nor the Code has in any way devitalized.

■ First, as the Second Circuit noted, there is no absolute requirement that books or records be kept or that they be kept in any particular way:

"The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts". 82 F.2d at 259.

A thoughtful opinion by the Seventh Circuit echoes this thought:

"What books of accounts or records satisfy the requirement of § 14, sub. c(2), are, of course, not a constant: In each case they are a function of the nature of the particular bankrupt's business transactions and financial condition. What would suffice in one would be hopelessly unsatisfactory in another." *In re Marks*, 125 F.2d 335, 336 (7th Cir.1942).

■ Second, the objective in bankruptcy is to secure the complete disclosure of the debtor's financial circumstances and what this requires by way of books and records is dependent upon the facts of the particular case. To quote *Underhill* again:

"Complete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books and records, then the absence of such amounts to that failure to which the Act applies". 82 F.2d, at 260.

The Seventh Circuit, puts the matter even more clearly:

"Records or books of accounts are but means to an end, the ascertainment of the bankrupt's financial condition and his business transaction and any records which meet that end are satisfactory. They should show in some way his loss and gains, and present a satisfactory explanation of the receipts and disbursements". *In re Marks, supra*, 125 F.2d, at 336.

■ Finally, even where the debtor has failed to keep and preserve the records necessary to complete disclosure he may still qualify for a discharge where he can justify his failure. This is what *Underhill* says in this regard:

"While it is always open to the bankrupt to affirmatively justify his failure to keep records, each case must stand upon its own facts with the inquiry always as to whether the bankrupt has sustained this burden of justification which the statute places upon him for his failure to keep adequate records". 82 F.2d at 260.

**816**

■ It is not the size, but the complexity of a business that determines whether books or records should have been maintained. *In re Halpern*, 262 F.Supp. 271 (E.D.N.Y.1967), *aff'd*, 387 F.2d 312 (2d Cir. 1968). The test is a loose one, depending upon the type of business and the type of person. *Morris Plan Industrial Bank of New York v. Dreher*, 144 F.2d 60 (2d Cir. 1944).

Records of exactly the character produced here—"a box of cancelled checks and bank statements, along with an uninformative spiral notebook", have been held adequate for a debtor self-employed as a tile-setter. *In re Doyle*, 272 F.Supp. 35, 38 (S.D.N.Y.1967): "Considering the fact that the bankrupt had been experiencing financial difficulties over the past several years and that he was engaged in what the referee aptly called a 'hand-to-mouth' business operation, the meager business records produced by the bankrupt are sufficient".

■ The evidence is uncontroverted that Usoskin produced her invoices, her receipts, her bank statements, and cancelled checks. In view of the simplicity of Usoskin's business which consisted of purchases from a handful of suppliers and sales for cash, her records were adequate to disclose her financial conditions to the plaintiffs or to anyone else who was interested. Her maximum income could easily be gauged by applying the store's customary margin to the purchases as shown by her receipts and invoices and then subtracting her known expenses as reflected on her checks. For the plaintiffs, particularly with their intimate knowledge of the operations of the store, Usoskin's records should have been more than ample to disclose what her financial condition was at the time she filed for bankruptcy.

The absence of records prior to her purchase of plaintiffs' store is not significant in view of the uncontroverted testimony,

supported by contemporary bank records that every dollar she had, plus what she could borrow from her relatives, was used to meet the down payment on the store she bought from the plaintiffs. Because the records preserved by Usoskin disclose her financial condition, the issue of justification is never reached. If it were, it would be satisfied by the fact that the debtor followed and relied upon the advice of her accountant.

The plaintiffs' objections that Usoskin lacked a general ledger or notes of her indebtedness to her relatives, or income tax returns for years she filed none, are meritless. Usoskin was not required to give her relatives promissory notes to establish her debts to them, nor to keep her records in the form of general ledger or to file tax returns. Bankruptcy law imposes no such requirements. To the extent that this Court, in denying the motion to dismiss at the end of plaintiffs' case, indicated otherwise, the Court was mistaken.

Just as there is no evidence that her records were insufficient to disclose her financial condition, there is likewise no evidence that Usoskin ever destroyed any records.

The plaintiffs have failed to to meet their burden of proving the insufficiency of Usoskin's records to disclose her financial condition.

## VI

■ The "Defendant's Post-Trial Memorandum of Law Statement" requests the invocation of sanctions against plaintiffs and their attorney in the sum of $5,000,00 pursuant to FRCP 11, which permits the Court to impose sanctions when it finds a pleading not well grounded in fact and interposed for an improper purpose such as to harass, or cause unnecessary delay, or a needless increase in the cost litigation.[4]

Mr. Tauber's memo reads:

4. Because of the long delay in the decision of this case occasioned by the extension of time requested by the parties to file briefs, the Court issued an Order that briefs would have to be filed by September 30th, and no further exten-

sions would be allowed. Plaintiffs are objecting to the reception of defendant's Post-Trial Memorandum of Law Statement because it was filed on October 1st. Mr. Tauber has explained that the delay was occasioned by the unavailability

"I respectfully submit this is a case of harassment ... plaintiffs and their attorney came to this court with no evidence except that a debt was due from defendant to plaintiffs. No facts presented by plaintiffs were adduced from evidence or obtained from the testimony of defendant came anywhere near to fulfilling the requirements of § 523 and § 727 of the Bankruptcy Code. This goes far beyond aggressive litigation, which is expected of any attorney".

This Court totally agrees with these statements.

As the plaintiffs' original complaint indicated, they had no grounds for objecting to defendant's discharge. Nevertheless, when told that their complaint would not survive a motion to dismiss, they filed an amended complaint invoking virtually every section of § 727. Their purpose was clearly to avoid a motion to dismiss regardless of the merits of their claim. What they did was simply plead the various provisions of § 727 in *haec verba* with total indifference to whether they had any evidence to support these allegations.

Through discovery, after they had pleaded, they confirmed what they probably already knew, which is that the debtor was her own bookkeeper and maintained her records in their raw form, giving some shadow of substance to their claim that she had failed to keep records. Otherwise, the minute, grueling examination to which they subjected this impoverished and troubled debtor produced not a scintilla of evidence, to support what the defendant's attorney correctly labels "a case of harassment".

The signature of Patel to the complaint constituted a certificate by him "that to the best of his knowledge, information and belief formed after reasonable inquiry, it [was] well grounded in fact". Bankruptcy Rule 9011. After the conclusion of the trial and after all the evidence was in, the best plaintiffs' attorney was able to say in support of their claim that assets have

of personnel due to Hurricane Gloria. The Court has decided to receive the defendant's

been concealed is that the "defendant must have some other private property and bank accounts in some other state, which the defendant has failed to disclose in her statement of assets in this case". Plaintiffs' Memo, p. 4. Thus, after a full trial, the facts which Patel certified existed by signing the amended complaint are yet to be proved. No assets were concealed, or could have been concealed, by a woman who bankrupted herself paying $14,500.00 in cash for dirty paper napkins and vermin infested candy worth, at most, $500.00. The plaintiffs had to know that their allegation that she had done so were false when they made it.

The conduct of the plaintiffs and their attorney has been characterized by bad faith in other respects, in addition to the lack of substance in the complaint:

Until the trial the Court never learned that the plaintiffs had proceeded with the sale of the debtor's store and its contents, in violation of the automatic stay. It is worth noting that Usoskin claims she never even received notice of the state court proceeding, which took out of the control of the trustee in bankruptcy the largest asset of the estate.

Even more serious is the fact that having filed this proceeding, plaintiffs' attorney deliberately failed to prosecute it, going on vacation in India and closing his office despite the fact that this case was scheduled for trial on April 30, 1984. Aggravating the inconvenience caused by his absence is the fact that before plaintiffs' attorney left he made a demand for documents covering a five-year period to be produced at his office within the next 30 days, a demand that he knew the defendant could not meet because he closed his office within days. He thereby ensured a fruitless effort on the part of defendant's attorney to meet a trial deadline that plaintiffs were simply ignoring.

brief despite the one day's tardiness.

Not only did plaintiffs' attorney fail to appear for trial on April 30th, he likewise failed to appear on the date to which the Court peremptorily adjourned the trial, May 17, 1984, and likewise failed to appear on the third trial date, June 7, 1984, resulting in the case being dismissed. As a result, the trial of this case which was scheduled to be held April 30, 1984, did not, in fact, even begin until October 26, 1984.

Further, the delay cost Usoskin the services of her original attorney, Richard Koral, Esq., who as an act of friendship was representing her without fee. It also necessitated, for her proper representation, the preparation by her attorneys of a motion to dismiss and papers in opposition to plaintiffs' motion to reopen, all of which would have been unnecessary had plaintiffs and their attorney not elected for their own convenience to disregard the April 30th trial date. All this has multiplied "the proceedings ... unreasonably and vexatiously". 28 U.S.C. § 1927.

Other improprieties are present. In this case, just as in the parallel proceeding against Ksenzowski, plaintiffs' attorney has submitted papers misstating what took place with respect to plaintiffs' failure to appear for trial on April 30, 1984. The facts are fully set forth in the Opinion of the *Ksenzowski* case being issued today, in which sanctions are being imposed on Patel and his clients. Up to the time of the trial in this matter, October 26, 1984, the papers submitted by Patel in the *Ksenzowski* case were identical with those submitted by him in this case.

In brief, Patel has consistently misstated the facts respecting the failure of himself and his clients to appear in court for trial on April 30, 1984. In this case, as in the *Ksenzowski* case, he asserts in one of his papers that he advised this Court of his plans "when the matter of this civil action was on calendar of the court in March, 1984". (Reply Affirmation to Defendant's Opposition and in Support of Plaintiff's Motion, dated August 10, 1984, para. 7). In fact, there was no court calendar in this matter in March, 1984 and the Court would never have set the trial for April 30, 1984 if it had known of his vacation plans. Elsewhere, Patel claims that he submitted an application from India which was granted and the case adjourned. (Application to Set Aside a Default Order and to Restore Adversary Proceeding to Calendar, dated July 26, 1984, para. 10). This statement is likewise untrue. No application for adjournment was ever received by this Court and the matter was adjourned in court on the date of the hearing without knowledge of the reasons for plaintiffs' absence.

These misstatements by Patel, plaintiffs' attorney, in his motion papers may have well influenced Mr. Tauber, Usoskin's new attorney, who was unfamiliar with the facts and who replaced her former unpaid counsel to consent to reopen the proceeding to the prejudice of Usoskin.

Aggravating the plaintiffs' abuse of the right to object to a debtor's discharge is that Usoskin finds herself in the court because she was victimized by the plaintiffs. After representing that she would receive inventory of a value of $10,000.00, the plaintiffs turned over to her spoiled, dirty merchandise. They have profited handsomely thereby. Today, they have their store back, plus $20,000.00 in cash. She has lost not only her money, but her health.

It is the opinion of this Court that in the extraordinary circumstances present here, Usoskin is entitled to recover attorney's fees from these men who have profited so much at her expense. Their conduct is so unequitable as to justify a departure from the prevailing American rule with respect to attorneys' fees.

## CONCLUSIONS OF LAW

The plaintiffs have failed to prove the existence of grounds warranting denial of Usoskin's discharge either from all her debts under § 727 or from her alleged debt to them under § 523.

Usoskin is entitled to an immediate discharge of all her dischargeable debts, including her debt to the plaintiffs.

Plaintiffs' complaint was not brought in good faith, but solely to hinder and delay the discharge to which Usoskin is entitled.

The complaint and other documents signed by plaintiffs' attorney were not well grounded in fact which was necessarily known to plaintiffs' attorneys when he signed them.

Plaintiffs have multiplied the proceedlngs in this case unreasonably and vexatiously.

Judgment will be entered in favor of Usoskin, overruling plaintiffs' objections to her discharge.

Sanctions are hereby imposed on plaintiffs and their attorney pursuant to Bankruptcy Rule 9011, 28 U.S.C. § 1927 and the general equitable powers of the court, including but not limited to an award of reasonable attorneys' fees, payable by plaintiffs and their attorney who are jointly and severally liable therefor.

A hearing will be held on Friday, December 13, 1985 at 10:00 in the forenoon at the United States Bankruptcy Courthouse for the Eastern District of New York, 75 Clinton Street, Brooklyn, New York 11201, Courtroom 214, to determine the full amount of such sanctions.